United States District Court
Southern District of Texas

**ENTERED**

April 23, 2021

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| S.M. B/N/F LAURA MUNOS AND | § | |
| JOEL MUNOS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-20-705 |
| | § | |
| SEALY INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Laura and Joel Munos, individually and on behalf of their daughter, S.M., sued Sealy Independent School District, alleging that it was deliberately indifferent to S.M.'s complaints that she was sexually harassed by fellow high-school students and sexually assaulted by a male student. S.M. asserts claims under Title VI and Title IX of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.*, 20 U.S.C. § 1681 *et seq.*, and under 42 U.S.C. § 1983. Sealy ISD moved to dismiss the amended complaint, S.M. responded, and Sealy ISD replied. (Docket Entry Nos. 27, 28, 29).

Based on the pleadings, the motion, response, and reply, and the applicable law, the court grants in part and denies in part Sealy ISD's motion to dismiss. The court denies Sealy ISD's motion to dismiss S.M.'s Title IX claim and grants the motion to dismiss her Title VI and § 1983 claims. The dismissal of the Title VI and § 1983 claims is with prejudice, because amendment would be futile. The reasons are explained below.

**I.     Background**

S.M. is a Hispanic fifteen-year-old female. (Docket Entry No. 26 at ¶ 17). In September 2019, S.M. was diagnosed with premenstrual dysphoric disorder. (*Id.* at ¶ 18). In mid-October

2019, S.M. transferred to Sealy High School in Sealy ISD and joined the basketball team and band. (*Id.* at ¶ 19).  S.M. alleges that two members of the girls' basketball team, T.A. and A.T., "[a]lmost immediately" began to harass her, throwing her "personal belongings . . . all over onto the locker room floor" and taking "her Airpods."  (*Id.* at ¶¶ 19, 20).  S.M. told her basketball coach, Sydney Jones, about the harassment.  (*Id.* at ¶ 21).  S.M. alleges that Coach Jones took no action in response to the complaints, even when the harassment became worse.  (*Id.* at ¶ 16).

At the end of October 2019, S.M. and a male classmate, N.S., spent time alone in the band hallway.  (*Id.* at ¶ 22).  N.S. spread a rumor that S.M. "had 'given him head' in the band hall." (*Id.*).  S.M. alleges that "no affectionate or sexual contact [occurred] that day."  (*Id.*).  The rumor spread widely.  (*Id.*).  Students harassed S.M. "multiple times a day" at school and on Snapchat, calling her a "hoe," "bitch," and "slut."  (*Id.* at ¶¶ 24–26).  In early November, S.M. told her band director, Ruben Cantu, about the harassment.  (*Id.* at ¶ 27).  S.M. told Cantu that "boys were propositioning her" and students were asking her, "how long did N.S. last?" (*Id.*).  Cantu advised S.M. to speak with Assistant Principal Jamie Hofford.  (*Id.* at ¶ 29).  Written district policy requires that any staff member "who learns of sexual harassment *shall* report it to the District's Title IX Coordinator" and "an investigation must proceed."  (*Id.* at ¶ 16 (emphasis in original)).

"Just days later," S.M. spoke with Assistant Principal Hofford.  (*Id.* at ¶¶ 30–31).  S.M. talked to Hofford after A.T. and T.A. asked S.M. during class "how long" N.S. lasted, loud enough for the whole class to hear.  (*Id.*).  During the meeting, S.M. told Assistant Principal Hofford about the rumor, the name-calling, the propositions, and that students were asking her how long N.S. lasted.  (*Id.* at ¶ 31).  S.M. also asked Hofford to review the video footage of the band hallway to negate the rumor about her and N.S.  (*Id.* at ¶ 34).  Assistant Principal Hofford gave S.M. a yearbook, asked her to point out any students who were harassing her, and said she would speak

to them.  (*Id.* at ¶ 32).  S.M. alleges that Assistant Principal Hofford did not question any of the students whose pictures S.M. identified.  (*Id.* at ¶ 33).

"Weeks after first speaking with S.M.," Assistant Principal Hofford viewed the video footage of S.M. and N.S. in the band hallway.  (*Id.* at ¶ 38).  Hofford called S.M.'s parents to inform them that no sexual contact had occurred between S.M. and N.S.  (*Id.* at ¶¶ 39–40).  Mrs. Munos described the harassment S.M. was experiencing and repeated that it had worsened since S.M. initially spoke with Hofford.  (*Id.* at ¶¶ 40–41).  Hofford replied that Mrs. Munos "needed to speak to her daughter about protecting her reputation."  (*Id.* at ¶ 42).

The harassment allegedly continued through November and the beginning of December of 2019.  (*Id.* at ¶ 46–54).  "More and more male students began to proposition" S.M.  (*Id.* at ¶ 36).  In one incident, members of the girls' basketball team surrounded S.M. and "taunt[ed]" her about the rumor with N.S.  (*Id.* at ¶ 46).  S.M.'s teammates on the girls' basketball team were the "worst offenders," "relentless[ly]" calling her a "slut," "ho[e]", and "bitch," joking about the oral-sex rumor, and asking her how "long N.S. lasted."  (*Id.* at ¶ 37).  S.M. "complained to [Coach Jones] on almost a daily basis in November about the bullying and sexual harassment."  (*Id.* at ¶ 47).  She also spoke to Head Coach Branch, who told her that "if he wasn't there to see it, he could 'not do anything about it.'"  (*Id.* at ¶ 50).  S.M. began to isolate herself from others, felt "lethargic, ate little[,] and was increasingly depressed."  (*Id.* at ¶ 52).

At the end of November, S.M. "experienced a breakdown" at home and told her parents that she wanted to quit basketball.  (*Id.* at ¶ 54).  On approximately December 3, Mrs. Munos contacted Athletic Director Shane Mobley to describe the sexual harassment and told him that she had already spoken with Hofford.  (*Id.*).  Mobley later met with S.M., who described the harassment to him.  (*Id.*).  Mobley allegedly told S.M. that "if he didn't see it 'it didn't happen.'"

3

(*Id.* at ¶ 55).  To S.M.'s knowledge, Athletic Director Mobley did not discuss the harassment with anyone.  (*Id.*).

One male student in particular, I.W., began staring at S.M. in class and "very obviously and purposefully move[d] his eyes around her body."  (*Id.* at ¶ 36). On approximately December 6, S.M. received several images and "overtly sexual messages" on Snapchat from I.W.  (*Id.* at ¶¶ 36, 56).  The next day after school, I.W. followed S.M. and her male friend, A.L., into a classroom.  (*Id.* at ¶ 56).  S.M. was frightened and asked another friend to come into the classroom, but I.W. chased both A.L. and the other student away.  (*Id.*).  I.W. then asked S.M. to tie his shoe. (*Id.* at ¶¶ 57–58).  S.M. knelt to tie his shoe.  (*Id.* at ¶ 58).  When she looked up, I.W. had pulled down his shorts and exposed himself.  (*Id.*).  I.W. grabbed S.M. by her hair and forced her head toward his penis.  (*Id.*).  S.M. tried to break away but could not because I.W. kept pulling harder on her hair.  (*Id.*).  S.M. yelled at I.W. to stop, but I.W. "took advantage of the opportunity and quickly and forcefully pushed S.M.'s head down and his penis further into her mouth."  (*Id.* at ¶ 59).  After four to five minutes, I.W. stopped without ejaculating and walked away.  (*Id.*).  S.M. was lightheaded because she had trouble breathing during the encounter.  (*Id.*).  She was "stumbling around" after the assault.  (*Id.*).  S.M. alleges that I.W. threatened her and told her not to tell anyone about the assault.  (*Id.*).  S.M. did not tell anyone.  (*Id.*).

Three days later, S.M. again met with Head Coach Branch.  (*Id.* at ¶ 60).  S.M. told him that the harassment had worsened, but she did not tell him about the encounter with I.W.  (*Id.*). I.W., however, did tell a group of students, including T.A., that S.M. had performed oral sex on him.  (*Id.* at ¶ 61).  In front of the basketball team, without S.M. present, T.A. told the girls' basketball coach, Coach Jones, about the new rumor.  (*Id.* at ¶ 62).  Later, the basketball team surrounded S.M. without letting her move and called her a "ho[e]."  (*Id.*).  S.M. thought the

harassment was still related to the rumor with N.S., not realizing that others knew about the encounter with I.W. (*Id.*). S.M.'s friend later told her that T.A. was spreading a rumor that S.M. "had 'given head' to I.W." willingly. (*Id.* at ¶ 64). S.M. alleges that the harassment "became relentless," occurring "every day and everywhere." (*Id.*).

At a basketball game on approximately December 10, A.T. asked S.M. in front of the team if she had throat lozenges, allegedly in reference to oral sex. (*Id.* at ¶ 65). S.M. told her mother about the incident. (*Id.*). Mrs. Munos met with basketball coach Jones to tell her about the lozenges comment, thinking it related to the previous rumor about N.S. (*Id.* at ¶ 66). Coach Jones did not tell Mrs. Munos that the reference was allegedly related to the rumors about the sexual encounter between S.M. and I.W. (*Id.*). On December 17, Coach Jones emailed Assistant Principal Hofford, saying that she was investigating rumors of sexual contact between I.W. and S.M. and that she would inform Hofford of her findings. (*Id.* at ¶ 67).

During the week of December 18, Mrs. Munos spoke to Assistant Principal Hofford and Band Director Cantu because S.M. was isolating herself and barely eating. (*Id.* at ¶¶ 68–69). Hofford told Mrs. Munos that she would investigate the allegations of sexual harassment, starting with the N.S. rumor. (*Id.* at ¶ 70). Hofford did not tell Mrs. Munos about the I.W. rumor. (*Id.*). S.M. alleges that Hofford did not investigate the rumors. (*Id.*).

S.M. alleges the harassment continued to worsen. (*Id.* at ¶ 71). A member of the basketball team told S.M. over Snapchat that new rumors were spreading that S.M. "was participating in sexual activities with many boys," including students from nearby school districts. (*Id.*). "By this time, S.M. was lethargic, rarely ate, had isolated herself[,] and was becoming increasingly depressed." (*Id.* at ¶ 72). A physician prescribed S.M. a different medication to help regulate her

5

hormones and to "deal with the continued stress and anxiety related to ongoing issues at school."

(*Id.*).  S.M. decided to quit basketball.  (*Id.*).

Soon after the district's winter break, around January 7, 2020, a doctor recommended that

S.M. see a psychiatrist specializing in adolescents and who could prescribe antidepressants.  (*Id.*

at ¶ 73).  S.M. followed that recommendation.  (*Id.* at ¶ 74).

Around the same time, S.M. met with Assistant Principal Hofford to tell her about the

sexual assault by I.W.  (*Id.* at ¶¶ 75–76).  When S.M. entered Hofford's office, Hofford asked

S.M., "[W]hat happened between you and I.W.?"  (*Id.* at ¶ 77).  Once Hofford heard S.M. describe

the sexual contact between S.M. and I.W. as forced, Hofford reported the assault to the Sealy ISD

Police Chief, Shannon Culpepper.  (*Id.* at ¶ 78).  Hofford placed S.M. in isolation for the rest of

the month while the investigation was ongoing.  (*Id.* at ¶ 79).  The district attorney was informed

but did not charge I.W. because I.W. said that the encounter was consensual.  (*Id.*).

A month later, in February 2020, Sealy ISD suspended S.M. for three days because she had

participated in a sexual act on campus, in violation of the school's code of conduct.  (*Id.* at ¶ 81).

Sealy ISD placed S.M. with I.W. in Disciplinary Alternative Education Placement.  (*Id.* at ¶ 83).

Because of the suspension, S.M. was allegedly unable to participate in softball or track.  (*Id.* at

¶ 84).

S.M.'s parents brought her to the Memorial Hermann Mental Health Crisis Center, where

S.M. was diagnosed with adjustment disorder with mixed anxiety and depressed mood and was

prescribed medication for anxiety and depression.  (*Id.*).  S.M. never returned to Sealy ISD.  (*Id.*

at ¶ 85).

In September 2020, S.M. and her parents filed their third amended complaint against Sealy

ISD, alleging violations of Title VI and Title IX of the Civil Rights Act of 1964 and 42 U.S.C.

§ 1983.  (Docket Entry No. 26).  Sealy ISD now moves to dismiss the amended complaint under

Federal Rule 12(b)(6).  (Docket Entry No. 27).

## II.      The Legal Standards

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be

granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a),

which requires "a short and plain statement of the claim showing that the pleader is entitled to

relief."  FED. R. CIV. P. 8(a)(2).  A complaint must contain "enough facts to state a claim to relief

that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Rule 8 "does

not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has

acted unlawfully."  *Id.*  (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Lincoln*

*v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555).  "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*,

556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  "A complaint 'does

not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief

above the speculative level.'"  *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir.

2019) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, when the allegations in a complaint,

however true, could not raise a claim of entitlement to relief, this basic deficiency should be

exposed at the point of minimum expenditure of time and money by the parties and the court."

*Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550

U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set

forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial

notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys Project, Inc. v. Lincoln*

*Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

## III.    Analysis

S.M. asserts claims under Title IX, Title VI, and § 1983.  Each is analyzed below.

### A.    Title IX

S.M. alleges that Sealy ISD sexually discriminated against her, in violation of Title IX,

because Sealy ISD had actual knowledge that S.M. "was a victim of bullying, harassment,

assault[,] and even sexual assault" and was deliberately indifferent to her complaints.  (Docket

Entry No. 26 at ¶ 101).  Sealy ISD argues that a motion to dismiss is appropriate because its

employees "took actions to mitigate and correct the alleged harassment."  (Docket Entry No. 27

at 9–10).

Title IX states that no person "shall, on the basis of sex, be excluded from participation in,

be denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."  20 U.S.C. § 1681(a). A school district receiving federal

funds is liable for student-on-student harassment if the district:

> (1) had actual knowledge of the harassment, (2) the harasser was under the district's
> control, (3) the harassment was based on the victim's sex, (4) the harassment was
> 'so severe, pervasive, and objectively offensive that it effectively barred the
> victim's access to an educational opportunity or benefit,' and (5) the district was
> deliberately indifferent to the harassment.

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

Sealy ISD does not dispute that S.M.'s alleged harassers were students under Sealy ISD's control while at school and that the alleged harassment was based on S.M.'s sex. Sealy ISD fails to address whether the sexual harassment before I.W.'s alleged sexual assault was sufficiently severe, pervasive, and objectively offensive as to constitute a bar to an educational opportunity. S.M. has alleged facts sufficient to show that the sexual harassment S.M. experienced was severe under Title IX's requirements.

While "[d]amages are not available for simple acts of teasing and name-calling among school children," *Davis*, 526 U.S. at 652, the harassment S.M. alleged before I.W.'s alleged assault was both sexual and far beyond teasing and name-calling. S.M. was harassed "multiple times a day," in the school hallway, on the school bus, in the locker room, and in class. (Docket Entry No. 26 at ¶¶ 26, 40). Students called her a "hoe," "bitch," and "slut," asked her sexual questions related to the rumors about her and N.S. and I.W., and gestured simulated oral sex. (*Id.* at ¶¶ 24, 27, 65). Male students propositioned her. (*Id.* at ¶ 36). On at least two occasions the members of the girls' basketball team surrounded S.M. and taunted her about the rumors. (*Id.* at ¶¶ 46, 62). The harassment continued online, with students sending S.M. sexual messages and images on Snapchat. (*Id.* at ¶¶ 25, 56).

As a result of the harassment before and after the I.W. assault around December 7, S.M. became lethargic and depressed, rarely ate, and began isolating herself. (*Id.* at ¶ 72). She was diagnosed with adjustment disorder with mixed anxiety and depressed mood and prescribed medication for anxiety and depression. (*Id.* at ¶ 84). The alleged sexual harassment was severe, pervasive, and objectively offensive. *See I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 373

9

(5th Cir. 2019) (conduct was severe, pervasive, and objectively offensive when students called the plaintiff a "whore" and "slut," spread rumors about her, excluded her during cheerleading, and asked about the race of the baby she would be having after an alleged rape; the alleged rapist wore the blood-stained pants from the assault to school; and students harassed the plaintiff online); *Reed v. Kerens Indep. Sch. Dist.*, No. 3:16-CV-1228, 2017 WL 2463275, at \*10 (N.D. Tex. June 6, 2017) ("Plaintiff has sufficiently alleged a consistent pattern of bullying, harassment, and teasing against J.R. by his classmates because of his failure to adhere to traditional gender stereotypes and his female-like appearance for purposes of Rule 12(b)(6)."); *Estate of Brown v. Ogletree*, No. 11-CV-1491, 2012 WL 591190, at \*16–17 (S.D. Tex. Feb. 21, 2012) (incidents of classmates simulating anal sex on plaintiff and calling plaintiff "gay," "faggot," "queer," "bitch," and "fuckhead" were sufficient to constitute severe, pervasive, and objectively offensive conduct based on sex).

S.M. also alleges facts sufficient to show that the harassment barred her from accessing educational opportunities. In late November of 2019, S.M. told her parents and the athletic director that she wanted to quit the basketball team. (Docket Entry No. 26 at ¶ 54). In late December 2019, S.M. quit the basketball team. (*Id.* at ¶ 72). Following her suspension in February 2020, she left the school district. (*Id.* at ¶ 85). Quitting a school team and leaving a school district because of harassment shows that the harassment barred access to an educational opportunity. *See Lewisville Indep. Sch. Dist.*, 915 F.3d at 373–74 (the plaintiff's feeling that she was unable to return to school because of the harassment barred her from accessing an educational opportunity).

### 1.    Actual Notice and Authority to Rectify

Sealy ISD argues that Assistant Principal Hofford was the only district employee notified of the harassment who had the authority to institute corrective measures on the district's behalf.

10

(Docket Entry No. 27 at 10).  Title IX requires actual notice to an employee "authorized to rectify" harassment.  *Brend v. Copperas Cove Indep. Sch. Dist.*, 823 Fed. App'x 261, 262 (5th Cir. 2020) (citation omitted).  An "appropriate person" must, at a minimum, have "authority to take corrective action to end the discrimination."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).  The authority to take corrective action constitutes the "power to halt the abuse," "perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision."  *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1247 (10th Cir. 1999).

S.M. alleges, and Sealy ISD does not dispute, that Assistant Principal Hofford is an appropriate person under Title IX's requirements.  Sealy ISD argues that any knowledge of S.M.'s complaints by "non-administrative" employees is insufficient for Title IX.  (Docket Entry No. 27 at 10).  Sealy ISD does not cite authority holding that all nonadministrative employees cannot qualify as an appropriate person under Title IX.  Determining who qualifies as an appropriate person is a fact-specific inquiry.  *See J.B. v. Klein Indep. Sch. Dist.*, No. 4:19-0210, 2020 WL 813020, at *8 (S.D. Tex. Feb. 18, 2020) (citation omitted) ("The Court has found no authority for the proposition that a teacher, or any school employee below the level of an assistant principal, cannot be an 'appropriate person' as a matter of law. Who qualifies as an 'appropriate person' is generally a question of fact.").

The facts alleged would allow a plausible inference that Athletic Director Mobley, Coach Jones, and Head Coach Branch were appropriate persons with "power to halt the abuse."  *San Elizario Indep. Sch. Dist.*, 106 F.3d at 660; *see C.K. v. Wrye*, No. 4:15-CV-00280, 2015 WL 5099308, at *6 (M.D. Pa. Aug. 31, 2015) (the court declined to dismiss a Title IX claim because

it could not yet determine whether a teacher's aide had authority to take corrective action); *Kinsman v. Fla. State Univ. Bd. of Trs.*, 4:15-CV-235, 2015 WL 11110848, at \*2 (N.D. Fla. Aug. 12, 2015) ("[I]t is plausible that the facts will show that [the associate athletic director and the head football coach] had enough authority over a member of the football team to take corrective action."); *Williams v. Bd. of Regents*, 477 F.3d 1282, 1294–95 (11th Cir. 2007) (the plaintiff sufficiently alleged facts showing the athletic director was an appropriate person under Title IX). The Title IX claim is not appropriately dismissed on this ground.

### 2.      Deliberate Indifference

A district with actual knowledge may be found liable if it was deliberately indifferent to student-on-student harassment. *Lewisville Indep. Sch. Dist.*, 915 F.3d at 368.   Deliberate indifference is a "high bar." *E.M. v. Austin Indep. Sch. Dist.*, 770 F. App'x 712, 713 (5th Cir. 2019) (per curiam) (quoting *Sanches*, 647 F.3d at 167).   Negligence or unreasonableness is not enough. *Id.*   A school district may avoid liability under a deliberate-indifference standard by responding reasonably to a risk of harm, even if the response is unsuccessful. *Ramos v. Webb Consol. Indep. Sch. Dist.*, 724 F. App'x 338, 340 (5th Cir. 2018) (per curiam) (citing *Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000)).   What makes a response reasonable depends on the facts of each case. *Dall. Indep. Sch. Dist.*, 220 F.3d at 384.   Sealy ISD contends that the pleadings are insufficient to allege that it was deliberately indifferent to S.M.'s complaints of sexual harassment and assault.   (Docket Entry No. 27 at 10).

#### i.      Sexual Harassment

S.M. alleges facts sufficient to show that Sealy ISD was deliberately indifferent to S.M.'s complaints and reports of sexual harassment.   Sealy ISD argues that it took sufficient action after each of S.M.'s complaints to Assistant Principal Hofford, Coach Jones, Head Coach Branch, and

12

Athletic Director Mobley, (Docket Entry No. 27 at 13), but its alleged responses were tantamount to inaction and "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. While a school district does not need to "remedy the harassment or accede to a parent's remedial demands," *Sanches*, 647 F.3d at 167–68, it must not, through its deliberate indifference, subject its students to continued harassment, *Davis*, 526 U.S. at 644.

The amended complaint alleges that Assistant Principal Hofford first learned of the sexual harassment in early November. (Docket Entry No. 26 at ¶ 31). Hofford asked S.M. to identify her harassers by name using the pictures in the school yearbook. (*Id.* at ¶ 32). S.M. alleges that although she did so, Hofford did not take any action following this conversation. (*Id.* at ¶ 33). "Weeks after" her initial meeting with S.M., Hofford viewed video footage of S.M. and N.S. in the band hallway. (*Id.* at ¶ 38). Hofford called S.M.'s parents to confirm that the videotape showed that nothing inappropriate had occurred between the students. (*Id.* at ¶¶ 39–40). In her call with Mrs. Munos, Hofford learned that the harassment had become worse since she met with S.M. weeks before. (*Id.* at ¶ 41). Hofford allegedly took no additional action. (*Id.* at ¶¶ 42–43).

Basketball Coach Jones allegedly first learned of the sexual harassment from S.M. in early November. (*Id.* at ¶ 37). S.M. allegedly complained to Jones "on almost a daily basis" that month. (*Id.* at ¶¶ 37, 47). Jones allegedly told S.M. to speak with Head Coach Branch. (*Id.* at ¶ 48). In December, Jones learned that the harassment was continuing. (*Id.* at ¶¶ 62, 66). Jones emailed Hofford, telling Hofford that Jones would investigate the new rumors about S.M. and I.W. (*Id.* at ¶ 67).

When Head Coach Branch first learned of the sexual harassment in November, he allegedly told S.M. that "if he wasn't there to see it, he could 'not do anything about it.'" (*Id.* at ¶ 50). In

December, Branch learned the harassment was worsening. (*Id.* at ¶ 62). He allegedly took no action in response to S.M.'s complaints.

Athletic Director Mobley allegedly first learned of the sexual harassment from S.M. in early December. (*Id.* at ¶ 54). Mobley allegedly told S.M. that "if he didn't see it 'it didn't happen'" and took no further action. (*Id.* at ¶ 55).

Sealy ISD argues that it was not deliberately indifferent because Assistant Principal Hofford "at least began an investigation into" S.M.'s concerns by asking her to identify the students who were harassing her. (Docket Entry No. 27 at 11).[1] Sealy ISD also argues it took sufficient action when Hofford viewed the video footage of S.M. and N.S. in the band hallway and called S.M.'s parents to confirm that nothing inappropriate had occurred between the students. (Docket Entry No. 27 at 13). Sealy ISD characterizes this response as "quash[ing] the rumors that [S.M.] performed oral sex on N.S." (*Id.*). The court disagrees.

Courts generally hold that a school district is deliberately indifferent to complaints of sexual harassment when it fails to confront the alleged harassers or institute corrective action. *Compare Davis*, 526 U.S. at 654 (the plaintiff sufficiently alleged deliberate indifference because the school board "made no effort whatsoever either to investigate or to put an end to the harassment"), *with Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 411 (5th Cir. 2015) (making students run laps as punishment for hanging a shoelace noose in the victim's locker was a "weak response," but it was not deliberate indifference), *and Doe v. Pawtucket Sch. Dept.*, 969 F.3d 1, 9–10 (1st Cir. 2020) ("[B]y failing to take any action to stem the tide of assaults against Doe, it is plausible that PLA officials 'disregarded a known or obvious consequence of their action or

---

[1] Sealy ISD also argues that this type of information is unavailable to S.M. under the Family Education Rights and Privacy Act (FERPA). *See* 20 U.S.C. § 1232g (Docket Entry No. 27 at 11). This argument is irrelevant on a motion to dismiss. S.M. needs only to allege facts that show a plausible right to relief.

inaction' and thus contributed to her likelihood of sexual assault . . . How this fleshes out in discovery remains to be seen."), *with Lewisville Indep. Sch. Dist.*, 915 F.3d at 374–78 (a school district was not deliberately indifferent because it (1) started its own investigation into an alleged sexual assault after the local police department closed its investigation; (2) was told by the victim's parents not to talk to the victim about her bullying complaints; and (3) interviewed 19 students about cyberbullying complaints), *and Nw. Indep. Sch. Dist.*, 689 F. App'x at 786 (a school district was not deliberately indifferent because it "disciplined students" and investigated complaints "intensively").

S.M. alleges that Sealy ISD did not report the alleged sexual harassment to the district's Title IX coordinator, confront S.M.'s harassers, institute corrective measures, or investigate the allegations beyond viewing a videotape. Instead, after viewing the band-hallway videotape, Sealy ISD called Mr. and Mrs. Munos and told them the rumors were false. (Docket Entry No. 26 at ¶¶ 39–40). These steps did not, and could not, remedy S.M.'s alleged harassment. The allegations are sufficient to state a plausible claim for deliberate indifference.

### ii.    Sexual Assault

S.M. sufficiently alleges that Sealy ISD was deliberately indifferent to her complaints of sexual assault. On December 17, Assistant Principal Hofford first learned of the rumors of "sexual contact" between I.W. and S.M. from an email sent by Coach Jones. (Docket Entry No. 26 at ¶ 66). The record indicates that Sealy ISD first discovered that the sexual contact between S.M. and I.W. was not consensual during Hofford's meeting with S.M. on January 8. (Docket Entry No. 27 at 12). At that point, Hofford immediately contacted the police, and the district attorney ultimately decided not to bring charges against I.W. (*Id.*). Sealy ISD suspended both S.M. and

I.W. for three days because they engaged in sexual acts on school grounds, in violation of the school's code of conduct.  (Docket Entry No. 26 at ¶¶ 81, 83).

Case law suggests that school districts should not rely solely on law enforcement's conclusions concerning claims of sexual assault.  *See I.L. v. Hous. Indep. Sch. Dist.*, 776 F. App'x 839, 841–43 (5th Cir. 2019) (a school district was not deliberately indifferent when it deferred to the findings of a police department investigation after conducting its own investigation into a sexual assault); *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, No. 18-2850, 2020 WL 7043944, at *15 (S.D. Tex. Dec. 1, 2020) (there was no showing of deliberate indifference because after the district attorney refused to press charges in a sexual assault investigation, the assistant principal reviewed a videotape showing evidence of the likelihood that "a consensual encounter [] went too far"); *Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 3:18-00243, 2019 WL 8273375, at *5 (S.D. Tex. Dec. 19, 2019) (a school district was not deliberately indifferent because it promptly launched an investigation in conjunction with the police once learning of the victim's sexual assault allegations); *Stinson v. Maye*, 824 F. App'x 849, 858 (11th Cir. 2020) (the court drew an inference of deliberate indifference when the principal did not investigate an alleged sexual assault and did not inquire about the extent of law enforcement's investigation); *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008) ("[S]chool districts should not solely rely on a prosecutor's discretion not to prosecute a sexual harassment case when responding to claims of sexual harassment. However, here the district relied on more, namely, that there were problems of proof in determining which conduct was not consensual and the fact that the police report described other admittedly consensual conduct.").

While a school district may rely on a law-enforcement investigation that results in charging a student with criminal behavior, *see Lewisville Indep. Sch. Dist.*, 915 F.3d at 378, it is unclear

16

whether a decision by law enforcement or prosecutors not to bring charges frees a school district from the need for further investigation.  That is particularly true when, as here, the law-enforcement investigation appears to be so limited.

At this stage of the litigation, S.M. has sufficiently alleged facts showing deliberate indifference to her complaints of sexual assault.

### B.     Title VI and § 1983

S.M. alleges that Sealy ISD violated Title VI of the Civil Rights Act of 1964 and her Fourteenth Amendment due-process rights.  In the response to Sealy ISD's motion, however, S.M. acknowledged that she "do[es] not have sufficient facts[] at this juncture in the litigation to maintain a plausible claim for either." (Docket Entry No. 28 at ¶ 2 n.1).  S.M. asks this court to dismiss the Title VI and § 1983 claims without prejudice, so that she can later amend if during discovery "facts are uncovered that support either or both claims." (*Id.*).

The court agrees that S.M. did not sufficiently allege facts showing a Title VI violation. To survive a motion to dismiss, S.M.'s complaint must allege facts that would allow a reasonable inference that Sealy ISD "engaged in intentional discrimination based on race." *Pathria v. Univ. of Tex. Health Sci. Ctr.*, 531 F. App'x 454, 455 (5th Cir. 2013) (per curiam) (emphasis omitted). S.M. suggests that Sealy ISD did not follow its Title IX reporting guidelines "because of an implicit . . . bias that girls of Hispanic descent were more promiscuous than their Caucasian peers," but she fails to allege facts that support this theory. (Docket Entry No. 26 at ¶ 2).  S.M. alleges that the "real-world implications of the[] stereotypes" from the "hyper-sexualization of Latina women in movies, on the news, and in music videos" are "especially harmful in youth settings such as schools where staff members rely on stereotypes to inform their decisions." (*Id.* at ¶ 93).

17

This allegation lacks the specificity required for the court to plausibly infer that Sealy ISD intentionally discriminated against S.M. based on her race.

The court also agrees that S.M. did not sufficiently allege facts showing a Fourteenth Amendment due-process violation.  S.M.'s constitutional claim against Sealy ISD is based on the district employees' failures to report S.M.'s sexual harassment complaints, which, S.M. alleges, allowed the harassment to continue and led to her sexual assault.  (Docket Entry No. 26 at ¶¶ 3, 98).  To succeed on this claim, S.M. must allege sufficient facts to infer that Sealy ISD had a constitutional duty to protect S.M. from nonstate actors.  *See Doe v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 855 (5th Cir. 2012).  The Supreme Court has held that the government has no duty to protect citizens from deprivations of liberty by third parties, except when (1) the government has a "custodial special relationship" with the plaintiff, or (2) the government took affirmative steps which put the individual in danger.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–202 (1989).  S.M. has not pleaded sufficient facts to support either the special-relationship or state-created-danger exception.

The Fifth Circuit has held that a public school does not have a special relationship with its students for the purposes of the Due Process Clause.  *See Covington Cnty. Sch. Dist.*, 675 F.3d at 857 ("[A] public school does not have a *DeShaney* special relationship with its students requiring the school to ensure the students' safety from private actors."); *see also Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1001 (5th Cir. 2014) (the parents of a student who committed suicide because of student-to-student harassment could not state claim under § 1983 because no special relationship existed with the school district); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412 (5th Cir. 1997) (en banc) (finding that no special relationship existed between a school and a student who was sexually assaulted by a school custodian); *Walton v. Alexander*, 44

18

F.3d 1297 (5th Cir. 1995) (en banc) (a residential public school for the deaf did not share a special

relationship with a student who was sexually assaulted by another student because the student

attended the school voluntarily with the option of leaving at will). S.M. does not allege facts

showing otherwise. *See Doe v. Wharton Indep. Sch. Dist.*, No. 2:16-48, 2016 WL 2610024, at \*2–

4 (S.D. Tex. May 6, 2016) (granting defendant's motion to dismiss as to the plaintiff's § 1983

claims but denying as to the Title IX claim); *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, No. 3:01-

CV-1092, 2002 WL 1592694, at \*3 (N.D. Tex. July 16, 2002) ("[T]he [school district] has not

restrained [the plaintiff's] freedom to act on her own behalf . . . so as to give rise to a deprivation

of liberty in violation of the Fourteenth Amendment, nor have the [plaintiffs] alleged any such

restraint.").

The Fifth Circuit has not adopted the state-created-danger exception, but it has held that

the exception would require a plaintiff to allege that state actors "used their authority to create a

dangerous environment for the plaintiff" and "acted with deliberate indifference to the plight of

the plaintiff." *Covington*, 675 F.3d at 865.  S.M. did not allege that Sealy ISD used its authority,

or affirmatively acted, to create a dangerous situation. *See Reed v. Kerens Indep. Sch. Dist.*, No.

3:16-CV-1228, 2017 WL 2463275, at \*16 (N.D. Tex. June 6, 2017) ("There are no allegations that

Defendant used its authority to create a dangerous environment or that it took an affirmative action

that made [the plaintiff] more likely to be harmed."); *Fletcher v. Lewisville Indep. Sch. Dist.*, No.

4:14-CV-359, 2016 WL 3381296, at \*4 (E.D. Tex. Mar. 9, 2016) ("[T]here are no allegations that

[the school district] affirmatively placed [the plaintiff] in a situation that would not have otherwise

19

existed or that [the school district] took an affirmative action that made [the plaintiff] more likely to be assaulted or harassed.").

This court denies S.M.'s request to later amend her complaint and dismisses the Title VI and § 1983 claims with prejudice.  Federal Rule of Civil Procedure 41(a) allows dismissal of a plaintiff's action without prejudice, but this rule applies only to an entire action, not individual claims.  *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 720 (5th Cir. 2010) (citing *Exxon Corp. v. Maryland Cas. Co.*, 599 F.2d 659, 662–63 (5th Cir. 1979) ("Rule 41(a) dismissal only applies to the dismissal of an entire action—not particular claims.")).  S.M. concedes that she does not have facts to support her Title VI and § 1983 claims, and she has repeatedly amended.  Because further amendment would be futile, these claims are dismissed with prejudice.

## IV.    Conclusion

Sealy ISD's motion to dismiss, (Docket Entry No. 27), is denied as to the cause of action under Title IX of the Civil Rights Act of 1964 and granted as to causes of action under Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1983.

SIGNED on April 23, 2021, at Houston, Texas.

_____

Lee H. Rosenthal
Chief United States District Judge